FREEMAN GAGE & others *vs.* MARYLAND COAL COMPANY.

Suffolk.    March 26. — May 25, 1878.    AMES & MORTON, JJ., absent.

In an action for freight of a vessel chartered to carry coal from G. to B. at a certain rate until November 1, there was evidence that the vessel was loaded and ready to sail from G. on October 17; that the master then asked for his bills of lading, but the defendant's agent, in obedience to instructions, refused to give them, except at the current rate, which was lower than that stipulated in the charter party, on the ground that the vessel could not reach B. within the time limited therein; that the usual time for the trip from G. to B. at that season was between six and seven days, although this was affected by the weather; that the master refused to sign bills of lading except at the rate named in the charter party; that on October 20, the agent, having received instructions, delivered bills of lading to the master, stating the rate of freight to be as per charter party; that the master signed the bills and the vessel started, grounded on a bar, and was unable to pass a certain bridge until the morning of October 23; that the vessel arrived in the lower harbor of B.

on November 1, and the next morning was towed up and her arrival reported to her consignees; and that her cargo was not discharged, without the plaintiff's fault, until November 7. *Held*, that the evidence would warrant a finding that, but for the delay caused by the defendant's acts, the vessel would have arrived within the time named in the charter party, and that the defendant was liable for freight as by the charter party.

CONTRACT by the owners of the Schooner Charles F. Sampson, on a charter-party, whereby the vessel was chartered to the defendant "for six successive trips, or as many as vessel can make from April 1 to November 1, 1874, from Baltimore, Maryland, and Georgetown, District of Columbia, to Boston, Massachusetts, and to be discharged in Boston below all bridges, at a good and safe place where there is sufficient water guaranteed; sufficient water at place of loading guaranteed by charterer;" freight payable in Boston on proper discharge of each cargo, at the rate of $2.50 per ton of 2240 lbs, for each and every ton delivered at port of discharge, and the charterer to tow the vessel from Alexandria to Georgetown and back.

At the trial in the Superior Court, before *Rockwell*, J., the following facts appeared: The master of the schooner had made five trips under the charter party, prior to the one in question. On this trip the master was told in Boston, before sailing, by one of the firm of Bangs & Horton, the selling agents of the defendant in Boston, that he would write to Georgetown for them to give his schooner good despatch. The schooner arrived at Georgetown on Friday, October 16, at six o'clock P. M., and the master reported her arrival at the office of the defendant's shipping agent. On Saturday morning, October 17, the master hauled in his schooner alongside the wharf, and commenced taking in coal, and completed the loading of the schooner at six o'clock P. M. of the same day. This was after sundown. The drawbridge below Georgetown is closed at sundown, and not opened thereafter. The master, after loading on the same day, reported at the agent's office that he had loaded and was ready to sail, and asked for his bills of lading. He was informed, by the clerk then in charge, that instructions had been received from the defendant not to give the master bills of lading, except at the rate of $1.60 per ton for freight, that being the current rate at the time, on the ground that the vessel could not perform her voyage under the charter party within the time therein limited. The master

refused to sign bills of lading, except at a rate of freight as per charter party. The clerk informed him that he should probably have further advises from the defendant by the next mail on Sunday morning, October 18, and he would inform him; but no advices were received, and no communication was had with the master on Sunday. On Monday, October 19, the master called at the agent's office, and was told that no other communication had been received from the defendant than the one referred to on Saturday. The master again declined to sign bills of lading other than with freight payable as per charter party. On Tuesday morning, October 20, the master called with like result. In the course of that morning, a telegram was received by the agent from the defendant, to let the schooner go with bills of lading making freight as per charter party, not naming rates, and to notify the captain before signing that the defendant would claim current rates of freight, if the trip was not completed before November 1. The master was sent for and this telegram was shown to him, the bills of lading of the coal, stating that the freight for the same was " at the rate of, as per charter party, per ton," were then filled up by a clerk in the office, and the master signed them. It was then nearly noon, and at two o'clock P. M. the schooner took a tug and started on her trip down the river; but before reaching the bridge she struck a bar across the river about a mile and a half below Georgetown. The vessel had on board about the same quantity of coal as on her previous trips. In consequence of some prevailing wind, the tide was then low on the bar. The schooner did not succeed in getting over the bar until about five o'clock P. M. of the following Thursday, October 22, when it was too late to pass the drawbridge, which closed at sundown. The next morning she started for Boston, arriving in Light House Channel on Sunday, November 1, between eleven and twelve o'clock P. M., where she came to anchor. The next morning she took a tug and was towed up into the harbor, and her master reported her arrival to the consignees, Bangs & Horton, at ten o'clock A. M., on Monday, November 2. They requested him to unload at the wharf of the Fitchburg Railroad Company above three bridges, which he was unwilling to do; but one of the firm stated it would be a convenience to them, and, as this was his last trip under the charter, the master

consented, receiving therefor the customary price of three cents per ton per bridge. It would take five or six hours longer to pass these bridges and unload, than to unload outside of the bridges. The schooner was discharged on Saturday, November 7, at six P. M. On applying to the consignees for the freight, the master was informed that the defendant had instructed them to pay him only $1.60 per ton for the freight, and that they could pay only that amount and the bridge money. The master declined to receive this, but did receive some money on account. There was evidence that the ordinary time for making a trip by a schooner of that class with her load, during that season of the year, from Georgetown to Boston, would be between seven and eight days, although this was affected by the weather.

The judge ruled, upon the foregoing facts, that the plaintiffs were entitled to recover freight at the rate fixed by the charter party, directed the jury to return a verdict for the plaintiffs for the amount claimed, and reported the case for the determination of this court. If the ruling was correct, judgment was to be entered on the verdict; otherwise, the verdict was to be reduced to the amount admitted to be due, and judgment entered thereon.

*J. Nickerson*, for the plaintiffs.

*D. Thaxter*, for the defendant.

ENDICOTT, J. There is no dispute about the facts in this case. No instructions were requested at the trial and no questions of law are in terms raised in the report. It does not appear that the defendant requested to go to the jury, and no such claim was made in the argument. The ruling therefore of the presiding judge, directing a verdict for the plaintiff in the larger sum, must be sustained, if it appears that the evidence would justify such a finding; of this we can have no doubt.

The vessel was loaded on October 17th and ready to sail. The master asked for his bills of lading, but the defendant's agent, in obedience to instructions from the defendant, refused to give them, except at the current rates of freight, (which were lower than those stipulated in the charter party,) on the ground that the vessel could not reach Boston within the time limited in the charter party, which was November 1st. It appears by the report that the usual time for the trip from Georgetown to Boston

446 at that season was between seven and eight days, though this was

at that season was between seven and eight days, though this was affected by the weather. The master refused to sign bills, except at the rate named in the charter party. On October 20th the agent, having received a despatch from the defendant, containing instructions, delivered bills of lading to the master, stating the rate of freight to be as per charter party. These bills the master signed, and the vessel started down the river, but was delayed by grounding on the bar, and was unable to pass the bridge until the morning of October 23d. She arrived in the lower harbor of Boston on Sunday, November 1st, and the next morning was towed up, and reported her arrival to her consignees. After her discharge, which was delayed several days, for which delay the plaintiffs appear in no wise to be responsible, the defendant refused to pay freight under the charter party because she had not arrived in season.

Upon these facts, it might well have been found that, but for the delay caused by the acts of the defendant, the vessel would have arrived within the time named in the charter party, and the defendant cannot deny its liability because the vessel did not so arrive. If a charterer is the cause of a failure to deliver the cargo according to the charter party, the ship is entitled to the stipulated freight. 3 Kent Com. (12th ed.) 229, note 2. *The Nathaniel Hooper*, 3 Sumner, 542.

*Judgment on the verdict.*